## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **S.S., by and through A.S.,**<br>     **Plaintiff,**<br><br>**v.**<br><br>**COBB COUNTY SCHOOL**<br>**DISTRICT,**<br>**SUPERINTENDENT CHRIS**<br>**RAGSDALE,**<br>**Officially, and**<br>**JESSICA COLEMAN, Officially,**<br>     **Defendants.** | **CIVIL ACTION FILE**<br>**NO. _____** |

## COMPLAINT

Comes now S.S., a student with a disability, by and through her attorneys, and makes this Complaint as follows:

### INTRODUCTION

Plaintiff S.S. is a school-aged child with a disability under state and federal special education laws. *See, e.g.,* Individuals with Disabilities Education Act, "IDEA," 20 U.S.C. §§ 1400 *et. seq.*; 34 C.F.R. §§ 300.1 *et seq.*; Section 504 of the Vocational Rehabilitation Act, 29 U.S.C. § 794; 34 C.F.R. 104.31; O.C.G.A. § 20-2-152; Ga. Comp. R. & Regs. §160-4-7 (2000).

S.S. lives with cerebral palsy, developmental delays, and a speech and language disorder that requires unique and individualized instruction in order for

S.S. to make meaningful educational progress as described by the IDEA.  For several years, S.S. has languished in the public-school system making little to no progress while her tolerance for such neglect and boredom manifested as inappropriate classroom behavior.

As a result of these behaviors, the District sought to move S.S. to a more restrictive placement rather than intensify her services.  The Family disagreed with the direction proposed by the District.  After attempting to resolve the matters through the planning process several times, the Family was left with no options but to pursue their right to dispute the decisions of the District.  On June 26, 2017, Plaintiff filed a Due Process Complaint against the Defendant Cobb County School District (referred to hereinafter as "CCSD or the District") alleging that the District failed to provide S.S. her rights to a free, appropriate public education in the least restrictive environment.

No administrative hearing was held.  Instead, on November 7, 2017, the Administrative Law Judge issued an "Order Granting Respondent's Motion for Summary Determination" which constituted a final decision. A copy of this Order is attached hereto as Exhibit A. Having exhausted all of her remedies in front of the Administrative Law Judge, Plaintiff seeks this Court to exercise its role in *de novo* review, and to overturn as a matter of law the final decision, hear additional

evidence in a full evidentiary hearing, and grant Plaintiff the relief sought in her Due Process Complaint.

## JURISDICTION AND VENUE

1. This action arises under 20 U.S.C. § 1415(i)(2)(C)(iii), seeking "such relief as the court determines is appropriate," as well as Title II of the ADA, 42 U.S.C. §§ 12131-12133 and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794(a)(2).

2. Plaintiff seeks declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 and an affirmative award of fees under 20 U.S.C. § 1415(i)(3)(B) if she prevails. This Court also has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. CCSD is found within the Northern District of Georgia, Atlanta Division, and therefore venue is proper in this Court. 28 U.S.C. § 1391(b).

## PARTIES

3. Plaintiff, S.S., is a "school-aged child with a disability" under IDEA. A.S. is her mother and legal guardian. A.S. is a "parent" under IDEA and possesses specific procedural rights.  Plaintiff resides within the CCSD's jurisdiction in Cobb County, Georgia which is not under the jurisdiction of the City of Marietta School District.

4. The CCSD is a Georgia educational agency or an "LEA" (local educational agency) under IDEA with the geographic boundaries of Cobb County. Under

IDEA, it is responsible for providing students with disabilities a "free appropriate public education" (FAPE), in the least restrictive environment (LRE), and for implementing its duties under special education laws by providing appropriate procedures and substantive programs. CCSD develops a grant proposal and/or a plan for its educational programs. It must provide services and procedures consistent with IDEA and has a legal duty to protect Plaintiff's procedural rights. CCSD has agreed to adhere to the requirements of IDEA. It may be sued and has consented to this suit under IDEA in this Court. The District may be served through its superintendent.

5. Chris Ragsdale is the superintendent of CCSD. As such, Superintendent Ragsdale is responsible for the administration of education, both regular and special education, in all educational settings in the CCSD. Superintendent Ragsdale is sued in his official capacity.

6. Jessica Coleman is the special education coordinator for CCSD. As such, Ms. Coleman is responsible for the administration of special education services and instruction to students with disabilities. Ms. Coleman is sued in her official capacity.

**EXHAUSTION OF REMEDIES**

7. Plaintiff brought an administrative due process complaint under IDEA and GDOE procedural regulations on June 26, 2017. Plaintiff served the Complaint

on CCSD and GDOE as required by law. The GDOE had an administrative

hearing officer (ALJ) appointed by the Office of State Administrative Hearings

(OSAH).

8. After a motion of the CCSD on summary determination (or summary judgment),

on November 7, 2017, the ALJ issued an "Order Granting Respondent's Motion

for Summary Determination" finding for the CCSD on all claims.

9. Plaintiff bring this civil action challenging the legal determination of the ALJ on

the meaning and implementation of IDEA within ninety (90) days of the Final

Decision of the ALJ, as provided by 20 U.S.C. § 1415(i)(2)(b).

10. Plaintiff has exhausted her administrative remedies on the claims pled in this

case, including the ADA and Section 504 Claims that were raised and dismissed

by ALJ.

## STANDARD OF REVIEW

The legal determinations under IDEA are before the district court on appeal

in this civil action as a question of law, subject to legal *de novo* review. *E.g.,*

*Walker Co. Sch. Dist. v. Bennett ex. rel. Bennett*, 203 F.3d 1293, 1295 (11th Cir.

2000); *Draper v. Atlanta Independent Sch. Sys.*, 518 F.3d 1275, 1284 (11th Cir.

2008).

## STATUTORY AND REGULATORY FRAMEWORK

11. The IDEA was adopted in 1975 to ensure that all children with qualifying disabilities receive a free appropriate public education (FAPE).

12. When the IDEA was reauthorized in 2004, Congress found that, *inter alia*, the education of children with disabilities can be made more effective by having high expectations of such children and ensuring their access to the general education curriculum in the regular classroom to the maximum extent possible. 20 U.S.C. § 1400(c)(5).

13. One purpose of the IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment and independent living." 20 U.S.C. §1400(d)(1)(A).

14. IDEA and Georgia law require local educational agencies to provide free and appropriate public education ("FAPE") to children with disabilities who, because of their impairments, need special education and related services. *See* 20 U.S.C. §§ 1400(c),1401; 34 C.F.R. §§300.1-300.627; O.C.G.A. § 20-2-152; Ga. Comp. R. & Regs. 160-4-7-.01 *et. seq*.

15. Parents are entitled to request an impartial due process hearing to contest any

decision.  20 U.S.C. § 1415(f); 34 C.F.R. §§ 300.504, 300.507-300.508; *See* Ga.

Comp. R. & Regs. 160-4-7-.12.

16. S.S. is entitled to FAPE from the District.  FAPE is special education services

and related services that --:

(a) Are provided at public expense, under public supervision and
direction, and without charge;
(b) Meet the standards of the state educational agency, including the
requirements of this part;
(c) Include an appropriate preschool, elementary or secondary school
education in the state involved; and,
Are provided in conformity with the individualized education program
that meets the requirements of Secs. 300.320 - 300.324.

34 C.F.R. § 300.17(2006); 20 U.S.C. § 1401(9) (same, except referencing statutory

provisions). CCSD is required to provide FAPE to S.S.

17. CCSD must follow IDEA's procedures, and procedural violations may entitle

Plaintiff to a substantive remedy if the procedural inadequacies:

(i)     Impeded the child's right to FAPE;
(ii)    Significantly impeded the parent's opportunity to participate in
the decision-making process regarding the provision of FAPE
to the parent's child; or,
(iii)    Caused a deprivation of educational benefit.

34 C.F.R. § 300.513(a)(2) (2006) (regulating 20 U.S.C. § 1415(f)(3)(E)(2004)).

18.  Educational programs for children with disabilities are designed and

implemented through an Individualized Education Program (IEP), that contains,

*inter alia*, statements of the following:  the child's present levels of academic achievement and functional performance; measurable annual goals; how the child's progress toward the goals will be measured; the specific educational and related services based on peer-reviewed research that will be provided to the child; the extent to which the child will be educated in regular education programs; and the frequency, location and duration of the educational and related services.  20 U.S.C. § 1414(d)(1)(A) (2017); Ga. Comp. R. & Regs. §160-4-7-.06.

19. At IEP meetings, among other activities and actions, "supplemental aides and services" must be developed and specified, as must program "modifications" and "support for school personnel." 34 C.F.R. § 300.324(a)(3)(ii).

20. At IEP meetings, among other activities and actions, the IEP Team must establish "the child's present levels of academic achievement and functional performance." 34 C.F.R. § 300.320(a)(1). The IEP Team must determine whether the goals are being achieved, and assess "[a]ny lack of expected progress toward the goals or the general curriculum." § 300.324(b)(1)(i) and (ii)(A). Parents must also receive data on their measurable goals on a periodic basis. 34 C.F.R. § 300.320(a)(3)(I) - (ii).

21. Parents and children are entitled to receive "Prior Written Notice" (PWN) which must be given a reasonable time before a district proposes to initiate or change the identification, evaluation or educational placement of the child, or rejects the parents attempt or request to do so. 34 C.F.R. § 300.503(a) . The PWN must include a complete description of the proposed action, an explanation of "why," a description of "each evaluation, record or report" supportive of the recommendation or action, the parents' right of protection, a description of "other options," and "other factors." 34 C.F.R. § 300.503(b)(1)-(7) .

22. Students have a right to be placed in the "least restrictive educational" environment appropriate to their needs. 34 C.F.R. §§ 300-114-300.116. This includes the provision of modifications and accommodations, and supplemental supports and services to allow for such instruction and placement. *See Greer v. Rome City School Dist.*, 950 F.2d 688 (11th Cir. 1990). CCSD must consider the quality of services and the potential for harm of its placement for S.S. 34 C.F.R. § 300.116(d).

23. Placement decisions are "made by a group of persons, including the parents, and other persons knowledgeable about the child, the meaning of the evaluation data and the placement options." 34 C.F.R. § 300.116(a)(1).

24. According to the U.S. Supreme Court,

> To meet its substantive obligation under the IDEA, a school ***must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances...*** If that is not a reasonable prospect for a child, his IEP need not aim for grade-level advancement. But his educational program must be appropriately ambitious in light of his circumstances, just as advancement from grade to grade is appropriately ambitious for most children in the regular classroom. The goals may differ, but every child should have the chance to meet challenging objectives**.**

*Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017)

(emphasis added).

## FACTS SUPPORTING CLAIMS

25. S.S. is a student in the CCSD who has received Special Education services there since the year 2000.

26. S.S. was born on March 28, 1997. S.S's mother, A.S., has legal guardianship over her. S.S. currently resides with her parents and siblings. S.S. has been diagnosed with cerebral palsy, developmental delay, and a speech and language disorder.  S.S. struggles with her gross motor skills. She also encounters challenges with functional communication and is almost nonverbal. S.S.  is a happy young woman who functions well with proper attention and individualized services.

27. S.S.'s circumstances at the time of this dispute were that she was an intellectually disabled student that required intensive instruction and services to

obtain educational skills necessary to live a fulfilled life.  S.S.'s educational

program would not be grade level curriculum, but with appropriate instruction

she could improve her communication skills, accomplish more adaptive life

skills independently and move onto the next phase of her life with greater

independence and dignity.

28. CCSD has failed to provide S.S. appropriate educational services and

instruction.  The minimal instruction provided to S.S. was not tailored to meet

S.S.'s unique needs, and the District failed to consistently provide the

instruction that was promised to the Family.  Since 2015[1], and before, S.S. has

made little educational progress.  She has not made appropriate progress with

her communication.  She has not obtained more adaptive life skills.  She has not

progressed towards independent life over the past two years.  This lack of

progress is wholly the consequence of CCSD failing to provide a free,

appropriate, public education.

29. As a result of the inappropriate education, S.S. developed disruptive classroom

behaviors to express her frustration and boredom in the classroom.  The

---

[1] IDEA and the State of Georgia apply a two-year statute of limitations to IDEA claims unless
"the parent was prevented from filing a due process complaint due to—
(1) Specific misrepresentations by the LEA that it had resolved the problem forming the basis of
the due process complaint; or (2) The LEA's withholding of information from the parent that was
required under this part to be provided to the parent." 20 U.S.C. 1415(f)(1)(A), 1415(f)(3)(A)-
(D)); 34 C.F.R. §300.511(f);

District's response to these behaviors was to move S.S. from her placement in a moderately disabled classroom to a severely disabled classroom.

30. At an October 8, 2015 IEP team meeting, without prior written notice, CCSD changed S.S.'s eligibility from Moderately Intellectually Disabled ("MOID") to Severely Intellectually Disabled ("SID"). CCSD also changed S.S.'s placement from an MOID classroom to a SID classroom at a different school.

31. S.S.'s parents disagreed with changes in S.S.'s eligibility and placement, and the school failed to provide sufficient justification for the changes. CCSD described S.S. as non-compliant and disengaged but did not provide any behavioral supports, data or evaluative information, or related services to address this issue.  The District's first response to the behaviors was to move S.S. to a more restrictive setting.

32. Despite the fact that CCSD complained about S.S.'s occasional noncompliance, CCSD never initiated a Functional Behavior Assessment ("FBA") or created a Behavior Intervention Plan ("BIP"). Instead, when S.S. exhibited noncompliance, her teachers ceased instruction.

33. It became clear that instead of implementing a program of instruction tailored to meet S.S.'s needs and provide educational benefit to her, CCSD preferred to place her in a classroom with less of a focus on functional skills learning and more of a focus on leisure activities.

34. S.S.'s parents disagreed with CCSD's decision, and exercised their IDEA right to remove S.S. from the placement and seek compensatory educational services through the IDEA dispute resolution procedures. S.S. was homeschooled from October 2015 until April of 2016.

35. On March 29, 2016, the IEP team convened for another meeting to discuss S.S.'s current educational placement and discuss options for future placements. The Team recommended that S.S. would return to the MOID classroom and the District would record educational data to evaluate whether S.S. was making educational progress.  S.S. attended school from March 2016 until May 2016 and was supposed to receive appropriate educational services and instruction during this time.  She did not receive either.

36. On May 24, 2016, the IEP team reconvened for another meeting. The team discussed S.S.'s current functioning and goals. The data showed that S.S. was regressing and was not making progress towards meeting her yearly goals and objectives.

37. The school did not meet S.S.'s classroom needs during this time.  School members of the IEP team reported that S.S. needed greater adult interaction, but this was not implemented because of the limited number of teaching staff assigned to the classroom.

38. During the meeting, the District voiced concerns over S.S.'s noncompliance with task demands interfering with instruction.   However, the Functional Behavioral Assessment (FBA) completed by the District failed to identify why S.S.'s behaviors were increasing or what should be done to address those behaviors.  CCSD developed an inadequate BIP and then failed to implement that inadequate plan.  The District at no time sought to instruct S.S. on appropriate replacement behaviors that fulfilled the function of S.S.'s disruptive behaviors.  The District did not recommend any additional supplemental services for S.S. in order to address increasing behavioral disruptions during class time.

39. In addition to lacking behavioral support, CCSD has not provided appropriate speech-language services to S.S. S.S. has not made meaningful progress on her speech/language development.  S.S. is almost non-verbal and benefits from augmentative communication devices and assistive technology.

40. CCSD also has not provided S.S. appropriate Assistive Technology ("AT") devices or services, and has failed to appropriately instruct S.S. on use of any such devices.  The District has provided devices in the past but failed to assess whether the device was working for S.S.  The District has failed to implement the recommendations of the IEP team with respect to AT, at one point failing to

add a button to S.S.'s AT device that would allow her to ask for a break despite the IEP Team agreeing it was needed.

41. Following the May 2016 IEP meeting, the Family pursued their IDEA right to an independent education evaluations for speech-language services and behavior.

42. On January 12, 2017, a Speech-Language evaluation was completed by a private evaluator.  The evaluator recommended an increase in speech-language therapy. The evaluator also stated in her report and during the in person meeting that S.S. was rarely non-cooperative and was easily redirected.

43. On December 28, 2016, Dr. Michael Mueller completed a private FBA. According to Dr. Mueller's report, the District had failed to provide the most basic, standard behavioral interventions to address S.S.'s noncompliance with instruction. Dr. Mueller reported that S.S.'s noncompliant behavior was likely the result of the District's inappropriate instruction, lack of reinforcers, and rewarding target behaviors.

44. Dr. Mueller observed that the District's practice of ending instruction at the slightest resistance from S.S. was ineffective to reduce the disruptive behaviors. In Dr. Mueller's opinion, the instruction and services provided to S.S. by the District were not properly tailored to S.S.'s needs and deficient in many ways.

45. Dr. Mueller concluded that S.S. was not gaining educational benefit and that she was simply being babysat. He reported that S.S. needs an individually tailored program including one to one instruction and that this can be achieved in either an MOID or SID classroom with the proper individualized aids and services.

46. The IEP team convened three more times in 2017 hoping to address S.S.'s lack of educational progress for the past two years.   The record of these meetings includes information showing that the classroom teacher was not effectively instructing S.S. and that S.S. had only minimal one to one instruction throughout the day.  The IEP team learned that the classroom teacher, by her own admission, was not able to meet the most basic expectations being placed upon her to educate S.S.

47. The IEP team reviewed educational information and data that showed S.S. had not made any meaningful educational progress during the past school year. When disputes arose about S.S.'s actual levels of life functioning, the Family requested an Assessment of Functional Living Skills to ascertain S.S.'s functional performance levels in an effort to develop some appropriate educational goals.

48. The District in response performed an inappropriate assessment, relying upon an assessment tool that Dr. Mueller noted was not appropriate for S.S.'s

situation. In addition, the District admitted that the personnel administering the test did not administer the whole test and those portions that were administered were done so incorrectly.

49. Dr. Mueller performed an appropriate assessment to secure the requested information and developed goals and objectives to add to S.S.'s IEP.  Based upon this assessment data, Dr. Mueller recommended more intensive instruction so that S.S. would receive meaningful educational benefit in light of her own circumstances.

50. During the most recent IEP meeting on May 12, 2017, surprisingly CCSD proposed to keep S.S. in the MOID classroom. Additionally, CCSD refused to recommend or provide additional supplemental aids and services despite information that the current plan was not appropriate. The District made no meaningful changes to S.S.'s IEP, instead they proposed a plan that failed to provide S.S. with any effective or individualized instruction and services.

51. Having attempted many times to collaborate through the IEP process, the Family was left with no alternatives but to pursue the dispute resolution process provided by IDEA.  On June 26, 2017, the Family sent their administrative due process hearing complaint to the District.  A hearing was requested by the Family at the Georgia Office of Administrative Hearings.

52. After the Family in good faith participated in the required resolution process, including a day long mediation, the parties reported an impasse to the administrative law judge (ALJ). On August 1, 2017, Plaintiff filed a "Petitioner's Status Report" informing the Court that an impasse had been reached at mediation and that Plaintiff was ready to proceed to trial.

53. The Family expected the IDEA forty-five day time restriction for a decision to be enforced. After not receiving an update from the Court regarding scheduling, Petitioner filed a "Petitioner's Request for Status Conference and Scheduling of Hearing" on October 9, 2017 requesting that the case be scheduled for trial. However, on November 7, 2017, the ALJ issued an "Order Granting Respondent's Motion for Summary Determination" finding for CCSD on all claims.

54. Since the time that Plaintiff filed the administrative due process hearing complaint on June 26, 2017 to the present day, CCSD has continued its failure to provide S.S. appropriate educational services and instruction. Plaintiff has continued to fail to make appropriate progress.

## VI. LEGAL ERRORS OF ALJ

### A. TIMELINE FOR FINAL DECISION

55. IDEA provides a specific timeframe for due process hearings requiring that the "public agency must ensure that not later than 45 days after the expiration of the

30 day period under § 300.510(b), or the adjusted time periods described in § 300.510(c) - (1) A final decision is reached in the hearing; and (2) A copy of the decision is mailed to each of the parties." 34 CFR § 300.515(a).

56. Plaintiff initiated the Due Process Complaint on June 26, 2017. Accordingly, the 30-day statutory resolution period expired on July 26, 2017. Then, the 45-day ensuing period for a final decision to be reached expired on September 9, 2017.

57. Neither party consented to an extension of IDEA time frames. On October 25, 2017, the ALJ conducted a phone status conference and tentatively scheduled the case for December 5, 6, and 7, 2017.

58. On November 7, 2017, the ALJ issued an "Order Granting Respondent's Motion for Summary Determination" finding for CCSD on all claims. This final decision fell substantially outside of the statutorily prescribed time limits by almost two months.

**B.  IMPROPER GRANTING OF SUMMARY DETERMINATION**

59. The ALJ failed to convene an administrative hearing and allow the presentation of live witness testimony from Petitioner. Without any opportunity to evaluate witness credibility, a full development of the factual record, or any cross examination, the ALJ issued an Order Granting Respondent's Motion for Summary Determination. See attached Exhibit A.

60. As an initial matter, the ALJ ignored OSAH Rule 616-1-2-.15 that requires that, "Affidavits shall be made upon personal knowledge, shall set forth facts that would be admissible in evidence, and *shall show affirmatively that the affiant is competent to testify to the matters stated therein*."  The ALJ relied upon affidavit expert testimony from school witnesses who were unqualified to render the opinions expressed in their affidavits.

61. A court evaluating a motion for summary determination must "view the evidence and draw all reasonable factual inferences in the light most favorable to the party opposing the motion" and "resolve all reasonable doubts about the facts in favor of the non-movant."  *Morton v. Kirkwood*, 707 F.3d 1276, 1280 (11th Cir. 2013); *Strickland v. Norfolk S. Ry. Co*., 692 F.3d 1151, 1154 (11th Cir. 2012).  Summary determination is not the proper mechanism for the Court to weigh conflicting evidence or resolve disputed factual issues, or assess the quality of the evidence presented. *Strickland*,692 F.3d at 1154.

62. The ALJ's findings of fact glossed over multiple disputes of material fact. The ALJ misinterprets the law and makes conclusions of law not supported by uncontested facts in the record.

63. The expert for the Plaintiff, Michael Mueller, PhD, BCBA-D, submitted a detailed Affidavit that was presented to the Court as an Exhibit to *Petitioner's Response to Statement of Disputed Facts and Motion for Summary*

*Determination*. A copy of this Response is attached hereto as Exhibit B-1, B-2, and B-3. In that affidavit, attached hereto, Dr. Mueller makes conclusions based on his review of the records, observations of S.S. in her classroom, and participation in the IEP meetings. To summarize, Dr. Mueller found that C.C.S.D. failed to provide FAPE to S.S. and made numerous other errors in failing to provide appropriate instruction and services. He gives factual examples to support his conclusions. This Affidavit alone creates an issue of fact for every legal issue presented in this case. However, the ALJ fails to reconcile this in his Order.

64. Several examples of the ALJ's erroneous findings of facts and conclusions of law include as follows:

   a. The appropriateness of the CCSD changing S.S.'s eligibility category to SID (Order p. 4, ¶6).

   b. The appropriateness of CCSD's decision to remove S.S. from Wheeler High School and place her at Pope High School (Order p. 4, ¶7).

   c. Continuing SID eligibility and placement during the 2016-17 school year.

   d. The appropriateness of the District's abbreviated "Brigance Testing" in Spring 2017 (Order p. 8, ¶22);

e.   The appropriateness of the goals and objectives proposed by Dr. Mueller and rejected by the District at the May 2017 IEP Meeting (Order p. 8, ¶23);

f.   Whether Dr. Mueller's and Ms. Needle's recommendations rejected by the school members of the IEP team were appropriate and necessary for S.S. to make meaningful educational progress as asserted by the Family. (Order, p. 7, ¶ 20).

a.   Whether a one-to-one paraprofessional is necessary for S.S. to make meaningful educational progress (Order, p. 9, ¶26-27).

b.   Whether S.S. has made progress on her goals and objectives as stated in the IEP (Order p. 9-10, ¶28-29);

65. The ALJ's Conclusions of Law misstate the current legal standards and employ selective quotations taken out of context to support the premature and incorrect conclusion.  The ALJ's erroneous or misapplied conclusions of law include:

a.   *Endrew F.* does not require "an ambitious IEP that guarantees progress," (Order, p. 13, ¶7)

b.   No school district guarantees progress but is required by *Endrew F.* to provide "appropriate progress," which depends "on the unique circumstances of the child for whom [the IEP] was created."  (Order, p. 13, ¶ 6-7).

    c. In *Endrew*, the Supreme Court found no issue with an IEP that "largely carried over the same basic goals and objectives from one year to the next." (Order, p. 17, ¶ 15)

66. In contradiction to the evidence presented by Petitioner, the ALJ incorrectly concluded based on inferences granted to the moving party that:

    a. The goals and objectives were measurable despite a question about the appropriate "rubric used for measuring" the IEP goals and objectives (Order, p. 17, ¶ 16).

    b. Respondent did not violate the Child Find provisions of IDEA. (Order, p. 19, ¶ 23.)

    c. Respondent properly evaluated S.S. in all areas of suspected disability when they conducted a psychoeducational evaluation without a functional behavioral assessment in 2015.

    d. Petitioner failed to provide "specific allegations regarding the inadequacies of the IEP." (Order, p. 16, ¶ 13).

67. The ALJ further erroneously concluded without evaluating witness credibility that:

    a. "[T]here is no evidence that the Petitioner disagreed with the Respondent's administration of the Petitioner's IEP," (Order, p. 13, ¶ 9).

b. Petitioner's parents "were upset with the Respondent's decision to move the Petitioner to another school, but did not complain that she was being denied FAPE...;" (Order, p. 13, ¶ 9).

c. No record evidence exists to show that the Petitioner's parents ever provided the Respondent with notice of denial of FAPE "prior to removing her from the placement and seeking compensatory educational services." (Order, p. 14, ¶ 10).

d. "S.S.'s parents' primary objection to the Respondent's decision to move S.S. was based on the actual geographical change from Wheeler to Pope High."  (Order, p. 17, ¶ 21).

68. The ALJ incorrectly granted the motion for summary determination finding that Petitioner's IEP is reasonably calculated to enable the Petitioner to receive educational benefit by failing to consider evidence presented by Petitioner  and resolving inferences in the record in favor of the moving party.

## COUNT I--CLAIM FOR RELIEF
## FOR VIOLATION OF THE I.D.E.A.

69. Plaintiff re-alleges and incorporates by reference as though fully set forth here the allegations contained in Paragraphs 1 through 66.

70. Plaintiff is a party aggrieved by the ALJ's Final Order within the meaning of 20 U.S.C. § 1415(i)(2)(A).

71. The ALJ's Final Order erred in denying the relief sought in the due process hearing request.

72. The ALJ's Final Order erred in finding that no genuine issues of material fact are in dispute with regards to whether the District denied S.S. her rights under IDEA.

73. The ALJ's Final Order erred in deciding that "there is no need for an evidentiary hearing on Petitioner's Due Process Complaint."

74. The ALJ's Final Order erred in finding that Respondent did not violate the Child Find provision of IDEA.

75. The ALJ's Final Order erred in finding that Respondent complied with the procedural and substantive evaluations requirements of IDEA in a timely fashion.

76. The ALJ's Final Order erred in finding that the IEP created for S.S. was reasonably calculated to confer a meaningful educational benefit to S.S. in light of her particular circumstances.

77. The ALJ's Final Order erred in finding that S.S. was not entitled to compensatory educational services to close the achievement gap created by the Respondent's denial of FAPE since 2015.

78. The ALJ's Final Order erred in finding that the IEP created for S.S. meets the standards set forth in *Endrew F.*

79. The ALJ's Final Order erred in finding that the IEP Placement, rather than the location of the implementation of the IEP, was appropriate in light of S.S.'s educational needs and her particular circumstances.

## COUNT II – VIOLATION OF THE
## AMERICANS WITH DISABILITIES ACT

80.  Plaintiff re-alleges and incorporates by reference as though fully set forth here the allegations contained in Paragraphs 1 through 77.

81. Plaintiff S.S. is a person with a disability within the meaning of the Americans with Disabilities Act ("ADA"). Her impairments substantially limit one or more major life activities, including learning, reading, concentrating, thinking, communicating, and developing and maintaining relationships.

82. At all times relevant to this complaint, S.S. has been and continues to be qualified to participate in Defendants' educational programs and services. 42 U.S.C. § 12131(2).

83. CCSD is a public entity as defined by Title II of the ADA 42 U.S.C. § 12131(1).

84. Through the acts described above, CCSD, Superintendent Ragsdale, and Defendant Coleman, as the Individual Defendants, are violating Title II of the ADA by denying individual S.S. the opportunity to participate in and benefit

from educational services that is equal to those afforded other students "by reason of" her disability.

85. CCSD and the Individual Defendants are violating Title II of the ADA by denying S.S. services that are as effective in affording equal opportunity to obtain the same result, gain the same benefit, or reach the same level of achievement as that provided other students because she is a person with a disability.

86. CCSD and the Individual Defendants are violating Title II of the ADA by denying S.S. the opportunity to receive educational programs and services in the most integrated setting appropriate to her needs by reason of her disability.

87. CCSD, as administered by the Individual Defendants, provides services sought by S.S. throughout their District, and there are other students with disabilities already receiving needed services that enable them to succeed, and for other reasons, granting relief to S.S. would not fundamentally alter CCSD's programs, services, and activities.

88. CCSD's acts and omissions, while acting under color of law, have caused and will continue to cause S.S. significant damage apart from the educational achievement gap that exists as a result of the failure to provide appropriate educational services.

## COUNT III VIOLATION OF SECTION 504
## OF THE REHABILITATION ACT OF 1973 -- 29 U.S.C. § 794(a)

89. Plaintiffs re-allege the allegations in all preceding paragraphs as though fully set forth herein.

90. As described in Count II, S.S. is an "otherwise qualified individual with a disability." By reason of her disabilities, S.S. is being denied the benefits of an educational opportunity that is equal to that afforded other students, and she is subjected to discrimination by Defendant.

91. CCSD is the recipient of Federal financial assistance and thus are subject to the requirements of the Rehabilitation Act, 29 U.S.C. § 794. Superintendent Chris Ragsdale is responsible for operating or administering these programs or activities and supervising their operations or administration.

92. The acts and omissions of CCSD and Defendants Ragsdale and Coleman constitute violations of Section 504 of the Rehabilitation Act of 1973.

93. The acts and omissions of CCSD and Defendants Ragsdale and Coleman, while acting under color of law, have caused and will continue to cause S.S. significant harm by intentionally discriminating against S.S. on the basis of her disability, denying her educational opportunities and failing to provide her appropriate educational services.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court take jurisdiction of this complaint, and:

a) Accept and review the administrative record, as required under IDEA; Take such additional evidence as it determines as necessary and proper; Reverse the erroneous legal analysis of the administrative hearing officer in the Exhibit A;

b) Review and reverse the legal analysis that CCSD provided S.S. a free, appropriate public education from June 2015 to present, that S.S.'s guaranteed rights to the procedural elements of IDEA were provided, that CCSD complied with IDEA identification and evaluation laws and implementing federal and state regulations;

c) Grant the Plaintiff declaratory and injunctive relief, and all appropriate relief under IDEA, Section 504 and the ADA;

d) Order and declare that CCSD is violating S.S.'s rights under Title II of the ADA, 42 U.S.C. § 12101, et seq., and its implementing regulations as well as Section 504 of the Vocational Rehabilitation Act;

e) Grant the Plaintiff as the prevailing party an award of their reasonable attorney fees and costs of litigation; and

f) All other and further relief this Court deems just and proper.

Respectfully submitted this 22nd day of January, 2018.

_____*/s/ Craig Goodmark*_____
Craig Goodmark
GA Bar No. 301428

Goodmark Law Firm
One West Court Square, Suite 410
Decatur, GA 30030
(404) 719-4848
cgoodmark@gmail.com

_____*/s/ Jennifer Yankulova*_____
Jennifer Yankulova
GA Bar No. 134789

Legal Aid of Cobb County
30 South Park Square, Suite 101
Marietta, Georgia 30090
(770) 817-5554
jyankulova@atlantalegalaid.org

## CERTIFICATE OF COMPLIANCE

This certifies that this is produced in Times New Roman, font size 14.

22nd day of January, 2018.

_____/s/ Craig Goodmark_____
Craig Goodmark
GA Bar No. 301428

Goodmark Law Firm
One West Court Square, Suite 410
Decatur, GA 30030
(404) 719-4848
cgoodmark@gmail.com

_____/s/ Jennifer Yankulova_____
Jennifer Yankulova
GA Bar No. 134789

Legal Aid of Cobb County
30 South Park Square, Suite 101
Marietta, Georgia 30090
(770) 817-5554
jyankulova@atlantalegalaid.org